Good morning. May it please the court, Judge Toshima, Judge Bivey, Judge Fischer, the attorneys on the appellant side for this first argument have agreed among themselves to divide our efforts into issues and time. And the issue division is Nevada related issues, then California related issues, then is the lake and the basin. And as to the lawyers, I am going first on the Nevada side, representing the National Fish and Wildlife Foundation, for eight minutes. Then Mr. Bank will go second for five minutes, representing the Nevada State Engineer. Then Mr. DiPoli, representing the Walker River Irrigation District, will go for nine minutes on the California issues. Then Mr. Hrstovitz, representing Monroe County, Nevada, and the Walker Lake Working Group, will go for five minutes on the is the lake and the basin. And we ask to reserve eight minutes for rebuttal. And we're prepared, as Judge Bivey mentioned, to attempt to track our pieces of the total time as we're up here. That's the most organized start on a very complicated series of cases, so it bodes well. Thanks. I hope it's not my high point, Your Honor. But taking that as my cue, this is an enormous range of complicated issues on which you've received hundreds of pages of Skip the usual introductory remarks and factual background, because you have all of that in the briefs. I propose to drill directly onto what I suggest is the core issue, at least for this first group of cases, and for the Nevada issues in particular. And that is, does state water law apply and govern the change applications under the Walker Decree? And the... there are about seven words that really matter in the order of the District Court. We refer to it as Order 1340, because that is the docket number under the ECF system. So for shorthand, that's the best way we came up with in talking about it. No matter the respective priorities, that's one group of words, and historical use, that's the second group of words. And I went back and forth many times in trying to decide and how to on these subjects, or whether the District Court intended to subvert or jettison Nevada water law on these subjects. But the briefing from the court's enforcement arm, because that's what the Board of Water Commissioners is, it's appointed by the court to enforce the decree. The briefing by the board makes absolutely clear that it intends to argue and have it be the position on the order that state water law should not apply. That the Walker River Decree should be this little system of decree law, which is untethered to Nevada water law, California water law, much less Ninth Circuit law and U.S. Supreme Court law, all of which teach us that we should be looking to state water law, both procedure and substance, when dealing with change applications under these interstate decrees in Nevada. As to the first point in the order, the court wrote, a user need only show that another user's use impairs his own rights no matter the respective priorities. And then the court commanded the remand to the state engineer and that the state engineer, quote, determine the average total number of days per year historically called for water and to limit approval of the change application accordingly. Those two pieces absolutely are 180 degrees wrong as to Nevada water law, California too, because Nevada water law allows the water user, the decree right holder, full exercise of his or her right, even with allowance. And that is enshrined in Nevada water law, both in statute and in Nevada Supreme Court decisions, and then multiple decisions of the decree court judges on the Truckee River decree and the Alpine decree. And this court, the quantity of precedent involving the application of Nevada water law to decree changes and decree issues in general is pretty astonishing when you search the Ordich decree or the Alpine decree or TCID or Truckee River. But wasn't the district court, in that phrase you quoted, in effect recognizing Nevada law, trying to tie it to the concession made in this case that, well, you know, we're only going to divert what amounts to consumptive use. And so it's the court's attempt to try to define what that consumptive use means, right? Isn't that what it amounts to? I don't think so, your honor. The state engineer's ruling already defined and quantified the consumptive use in a specific amount, both quantity and flow. What about timing? Well, timing is allowed under the decree from the first day to the last day of the irrigation season. And the state engineer's scientific evidence, which resulted in the 3.1 acre-foot per acre limitation on consumptive use, took into account all of these variables we're now discussing in the briefing, and first in the briefing, I might point out, not raised in attacking that study at the state engineer's hearing or even at the district court level because the stone in the record is the description of what's contemplated in that quantification. Variable starting times, different cuttings, different weather, all of that is enveloped into that 3.1, and then the conclusion of the state engineer and the limit established by Nevada law is really, and phrased the other way around, we're not allowed to enlarge our right. And the 3.1 and its conversion into the flow rate establish exactly that. No enlargement of our right. But the district courts seem to be concerned with sort of the, for lack of a better term, sort of the maladministration of the water. That is, that the water wouldn't be administered on a day-to-day basis in the same way that it had been done in the past. So even if the total amount of water, the consumptive rate, the 3.1 AFA or the 4.122 CFS, that even though the total amount would be consumed, that it would be sort of misadministered because there had been a cutting, because you historically cut in the Mason Valley on June 3rd and therefore didn't call for the water on June 3rd. So is that significant in any way to the farmers? It is not for several reasons, Your Honor. One of the primary ones being the principle of rotation. I'm sorry, principle of what? Rotation. That being that water's running down the ditch, I use it to flood my alfalfa field, I stop my flooding, it flows down the ditch to the next guy, he floods his field. It's not like there's a delivery of a certain number of molecules to my farm and then that delivery stops and then something else happens upstream. Rotation is one of the founding principles of efficient use in Western water law. So you have both rotation and the contemplation in the state engineer's study that the 3.1 limitation is what was used by the plants. That's what's gone from the system when the irrigator has used his water. And so having that depart from the system by staying in the system, in other words, running in-stream down from the point of non-diversion, can hurt nobody. But if every June 3rd a junior user knew that the senior user was planning on taking the first cut and therefore that there would be water in the system available on June 3rd, if the foundation now calls for the water on an average basis every day, does that affect the junior user in any way? I'd say no, Your Honor, because in the first place there is no such thing as an always on June 3rd. If it's raining on June 3rd, they may do it on June 5th. And if there's not enough water in the system, the variability of all these factors is built into the total figure that's allowed under the state engineer's ruling. And the water master himself stated that he was able to administer the quantities allowed in the state engineer's ruling. I see that I've gone past my time, so I will thank the Court and yield to the next arguer. Thank you, Mr. Springer. Your Honor, it's Micheline Fairbank on behalf of the Nevada State Engineer. This morning I plan to address three factors. First, why the district court's order erroneously remands back to the state engineer to conduct the very analysis which was already the basis of the consumptive duty portion of NIFWIS water rights. The process engaged by the state engineer in making his findings. And finally, to answer any questions that this Court may have with respect to the state engineer's process and procedures in this regard. The district court's order erroneously concludes that NIFWIS change applications enlarge their water right. And as has been argued already by my esteemed colleague, Mr. Springmeier, the finding is in contravention of not only the evidence, but Nevada water law. The Nevada State Engineer utilized the best available science in making his determination. And that included a scientific study, the evapotranspiration and net irrigation water requirements for Nevada. And in utilizing that scientific data and that scientific study, the state engineer in looking at the totality of facts and circumstances was able to make the determination that NIFWIS applications do not injure existing rights. The methods that were used in the study begin at the state engineer's experts at the record at page 1098. And I would note that beginning at page 1121, these calculations, as was already addressed by Mr. Springmeier, include simulations of cutting periods, time when water is cut off, initial and late crop stages, roughness of crop surface, crop geometry, soil characteristics, root growth, precipitation runoff, simulated irrigations, among many other factors. And these factors were specific to the Mason Valley area. It took into account the weather, precipitation patterns, and many other factors. So all of this data was included in making that determination of what the consumptive portion of those water rights were so that there would not be an injury to existing rights. Well, is the determination of the consumptive portion being challenged? The consumptive portion has not been challenged. But the issue of it is that it's not the 3.1 acre feet that's directly being attacked, although that's now being raised with regards to this particular appeal. And that wasn't challenged below before the state engineer or the district court directly. But the issue is that what's happening is by Judge Jones's decision, by the district court's decision, what it's asking to do is there's already been a reduction, a limitation and minimization of that water right. And now what's happening is all those factors which were already considered, the state engineer has been directed to go ahead and further reduce based upon some unknown. And I'll get to that in just one moment. Before you do, I want your view on one thing. One, what is the district court's scope or standard of review of the state engineer's order? And two, what is our standard of review of the state engineer's order or the district court's order? So the standard of review in this particular case by this court is de novo review. And that is because we're challenging. Everything is de novo? It's a de novo review. There's challenges to the interpretation in Nevada law which warrants a de novo review. And also there could be the analysis of a mixed question of law and fact which further is a de novo review. The standard of review by the district court is largely governed by the 1996 administrative rules. And while that does provide for an administrative and a de novo review, there still is Nevada law which is implicit in this particular matter. I found the paragraph on the administrative rules very, very confusing. Because it starts off by saying that you get de novo review and then proceeds to list a whole bunch of factors which are all nearly identical to those found in the Administrative Procedure Act. And that's not de novo review. So in the same paragraph, I've got mixed signals in those 1996 regulations. And that's the basis of my assertion that certainly the administrative rules provide for de novo review, but there should be that sort of deference and acknowledgement that the state engineer, who is the subject matter expert, that there should be a deference as to his particular decision. Could the district court under that de novo review standard 7.9 have decided to rehear all of the evidence that was heard before by the engineer? I would challenge that. The answer would be no. But since he didn't, isn't he obligated then to review it under more like an APA-like review and look for substantial evidence? That would be my position. I'm out of time, Your Honor. Okay. Good morning. Gordon DiPoli on behalf of the Walker River Irrigation District. The lease demonstration program that NIFWF and the district agreed to is a stored water program intentionally. As I will explain, once water is placed in storage, it is not part of the river's natural call and is not natural flow and is not subject to the call of the river. The district court's ruling missed the fundamental difference between changes to a natural flow water right and changes to a stored water right and misinterpreted the relevant California statute, which allows the amount changed to be either the amount consumptively used or the amount stored. Successful water marketing programs are most always based upon stored water. It is important that the issue be that the erroneous ruling that the court made be corrected here, not only to this stored water program, but also to California law in general. Does the water district have decreed rights? The water rights, the district appropriated the water as allowed by the Nevada Irrigation District Act. There are the two California licenses for the water rights in Toopridgeport and Topaz Reservoir, and the decree specifically recognizes the district as the owner of the water and specifically allows the district to distribute that water to the lands within the district. Okay, maybe I don't understand this well enough to ask the question right. I'm still asking whether the water district itself is a decreed owner, whether they have rights in the river itself. I understand they're storing water. Do they have decreed rights? Their rights to store are decreed rights in the sense they can divert water to the reservoirs without regard to priority during the non-irrigation season and in priority when all other rights... They're decreed storage rights. Yes. Okay, now are the lessees, the people who are getting water from the district, are any of them decreed owners of the water? Or do they simply have leasing contractual rights? Two parts to that, Your Honor. The district, when it allocated the stored water, it allocated some of that water to be supplemental to people who have natural flow rights so that their natural flow rights, which aren't fully satisfied, they can call on stored water to supplement those. The district also allocated water to what is referred to as new land, which is people who have no natural flow rights. So the answer is that in some cases, yes, and in some cases, no. Okay. But as to the rights to the stored water, they are pursuant to the district allocation as storage. They don't come to the landowners via the decree. They come via the allocations under the Irrigation District Act itself. But whether they receive the water or not, it's a matter of a contractual right. In other words, if they don't receive it, do they have standing to sue, say, an upstream owner for wrongful diversion? If they do not receive the stored water, their bone to pick is with the district and the district board, Your Honor. The water is allocated. That's the only legal remedy, isn't it? Yes, Your Honor. As to the stored water, yes. Do we have to analyze this case under California law for purposes of California aspect and Nevada law for when it crosses the state border? I think you have to analyze it under California law, but I do not think the law is different in either state, Your Honor. The California case law is very clear that the owner of stored water is not required to abandon any part of that water for the benefit of the natural flow, even to the extent in the Oakdale, Stevens v. Oakdale irrigation case, even to the extent of using the water a second time. And although we don't have any cases in Nevada on the topic, Your Honor, we have a Nevada statute which specifically says that stored water may be placed into a natural stream, mingled with the water in that stream, and then reclaimed. And that's, in my judgment, absolutely consistent with the Nevada law. The district court here did not find any injury to natural flow rights, even though the U.S. Board claims there was. And the reason there's no injury is what I just said. There is no requirement that return flow be in the stream for natural flow rights, and so there is no requirement that natural flow rights, there's no requirement to be limited to a consumptive use to satisfy natural flow rights. What the district court seemed to be concerned with was the other parties who had stored water who might not participate in the stored water program, somehow not getting their water if the amount wasn't limited to the consumptive use. As I indicated, California law in the relevant statute says it's limited to either the consumptive use or the stored alternative, and that's the difference between natural flow and stored water. Natural flow is part of the river's system, whereas stored water is artificial. It wouldn't be there but for the storage. The district's rights are an example. The water is stored during the non-irrigation season or when all other rights are being satisfied, and so if it hadn't been stored, it would have been all the way downstream and would not have served any water rights. In terms of injury to the stored water users of the district, first of all, the court treated the annual allocations by the district as if they were decreed rights. They're not, but even if they were, they're not injured, and the best way for me to explain that is to give you an example of what would happen to 10 acre feet in a reservoir if it's used for irrigation compared to what happens to 10 acre feet in the reservoir if it's used for in-stream flow. If it's used for irrigation, it's released from the reservoir 10 acre feet. The reservoir is down 10 acre feet. You don't know what the consumptive versus the non-consumptive portion is until it gets downstream and somebody actually uses it. The same result for the in-stream flow. The water is released, 10 acre feet go out, reservoir is in the exact same position. It's down 10 acre feet. The one thing that the district court was concerned with as well was releases after the irrigation season somehow causing injury. That really is a red herring. This water is going to be released. If it can't be released in the irrigation season, it will be released during the irrigation season, and the reservoir is going to be the same that year and the next year as it would have been had there not been a program. My time is up. Good morning and may it please the court. My name is Simeon Herskovitz. I'm here on behalf of Mineral County and the Walker Lake Working Group. I will focus my comments on the issue that was addressed by the district court below regarding the exclusion under the district court's reading of the decree of Walker Lake from the Walker River Basin. Now, as our briefs have made clear, our view is that there is literally no support in the law or in reason for an exclusion of the lake from the Walker River Basin. It doesn't jive with any hydrological data or information or source material. It's not commanded or even indicated in the decree itself. And if there is a plain meaning of the decree, it should be relatively apparent from looking at dictionary definitions and uniform materials that a river basin includes the bottom of the basin, which in a closed basin or endoheric basin means a lake or a sink at the bottom unless it flows out into a larger river, a bay, or an ocean. So there's no logical or rational reason why one would expect Walker Lake to be excluded. Didn't Judge Jones rely on an ordinary dictionary definition? He said there were two and he chose one, right? Well, yes, Judge Tashima. However, I would point out that there are numerous definitions in each general usage dictionary, and certainly in Webster's second, which would have been the authoritative dictionary at the time of the original decree and its revision in 1940, and under Webster's first and the current edition of Webster's, which are the more standard ones, the definitions that apply to physical geography or geology, both of which would be applicable here, clearly explain that the bottom of a basin is contained within the basin. So Judge Jones, in our opinion, looked to a dictionary and chose one among several definitions of the dictionary that through a strained reading could be made to justify a counterintuitive explanation for the language of the decree. If Walker Lake were not a terminal lake, but there was a pass-through, in other words, it sort of puddled at Walker Lake and then continued south to Hawthorne, would the lake still be part of the basin? Well, yes. Any questions about that? No, Your Honor. If the river passes through a lake, and you were talking about the river basin, it would have to include the lake, right? Yes, and every statutory definition as well as the dictionary definitions indicate that and don't leave any doubt about it. A basin contains everything right down to the bottom of the basin. Now, of course, when you talk about a river basin that flows into the ocean, you don't typically include the ocean because then you're talking about the larger basin. And that's where sometimes you might say that a basin ends without including the destination of the water at the bottom of the basin. But in any kind of closed basin, that would have to include a lake or a wetlands or a playa or a sink at the bottom. And certainly, as you've said, any reservoir or any natural lake within the drainage system on the way down towards the bottom would be contained, and there would be no question about that. Now, I guess I would also point out that Judge Jones interpreted this decree in a way that I don't think is at all in accord with the way that the original district court judge, Judge St. Schur, and there may even have been previous judges in the 19-teens and 20s who addressed Walker River water rights and issues, but I don't believe his reading in any way is consistent with what the case law reflects. Both the district court back in the 1930s and the federal court of appeals, this court actually, in the late 30s and 1940 when it issued a ruling requiring greater recognition of the Walker River Paiute tribe's water rights, those decisions, those contemporaneous court rulings and views, described the Walker River basin or valley as containing the lake and referred to historical materials going back to the mid- and late-19th century  common sense would indicate that the lake was part of the basin, was part of the valley of the Walker River. And as we've pointed out, the standard materials that the U.S. Geological Survey and California and State Water Agency, the State Water Resources Control Board in California, and the State Engineer's Office in Nevada, they both have defined historically the Walker River basin as including the lake and indeed including the hills or mountains to the east of the lake that also drain into the lake. So it's clear that they've adopted consistently, and the courts in their original rulings when the decree was issued adopted a view that makes more sense and is consistent with science, namely that the entire area in which the drainage heads towards the bottom in the Walker River basin includes the lake and indeed includes drainage areas to the east and to the north of the lake that don't drain into the river itself. My time is up. Thank you, Mr. Harrison. Ms. Peterson? May it please the Court, good morning. Karen Peterson from Appleton McKenzie Law Firm in Carson City, Nevada, representing the U.S. Board of Water Commissioners. And I would note that the Water Master is in the audience today here. So just to start out, a couple things about the decree. The decree was written so that the water is used as many times as possible throughout the system by as many users as possible throughout the system. And the Water Master sets the priority every day under the decree. And if for some reason a senior water right holder under the decree is not using his rights, depending upon the natural flows in the system, depending upon the return flows in the system, depending upon the demand, the Water Master may be able to change priorities, allow more priorities to be served under the decree, and therefore serve more users under the decree. Another thing that's important to remember about the decree is the refill right that's set forth in the decree specifically for the two reservoirs. And that refill right is during the irrigation season. And the other thing to remember is that farmers don't call for their water every day because they can't use their water every day. And it's like your garden. You don't put water on your garden 24 hours a day, seven days a week for weeks on end because your garden's going to die. That's the same with farmers. They're not able to use their water every day during the irrigation season. And so the state engineer enlarged the right, the NIFWF right, that's what we call the National Fish and Wildlife Foundation, enlarged the NIFWF right in the transfer, and I'll show you exactly how he did that. He granted the flow rate, which was the consumptive use portion. So when you say enlarged the right, you're talking about the legal rights or, you know, the actual use rights? The actual use rights. Well, suppose they have the legal rights to the larger actual use rights. Well, they only have the right to transfer the amount that's historically been beneficially used. And in the irrigation season... Well, you're not challenging the 3.1 determination, are you? Not determining that at all. Talking about the timing issues and why the district court judge was correct about the timing. And what the state engineer did, just so you know what his calculations were, he multiplied the 4.122 CFS, which is the consumptive use amount, and he multiplied that by the conversion that you do from acre-feet to acre, and then he multiplied it by 245 days, which is the entire irrigation season, March 1st through October 31st. And that comes out to 2,003 acre-feet. This is at RID's opening brief on page 43 to 44. And this year's a really good example because there's so much water in the system. The watermaster's pretty much been on full decree for the whole year. And NIFWF made no bones about it. They're going to call for their water every day of the year for that in-stream use. So NIFWF, from March 1st until now, NIFWF would have called for that water every day. But as I just explained to you, the farmer would not have called for the water every day because the farmer can't use the water every day. Well, I don't understand why under the Nevada Water Law they don't have the right to call on that every day. Because they're expanding the use. And let me show you. I can show you with the example in the consumptive use example that's in the state engineer's report. But the water law doesn't limit consumptive use to timing on certain days, right? Yes, it does. Well, the no-injury rule does. The what rule does? The no-injury rule. The no-injury rule under the creed does not allow on a transfer a senior water right holder to expand and enlarge their right on the transfer. Well, that's an injury to the junior appropriator's vested rights. But it doesn't injure your vested rights, does it? It does injure. You still have the right to that amount of water. In this case, NIFWF, the senior decree holder is going to be using more water. The foundation is going to use 3.1 acre feet at the end of the season, which is how much the prior appropriators would have used at the end of the season. Correct. As consumptive use. Correct. But look at the timing of how the appropriator used that. And you picked up on that in your question. That's my point. There's nothing in – can you cite a case that says, you know, timing is a part of your right? I can cite you to the recent case that – So we've got a June 3rd problem because prior appropriators often cut their alfalfa on June 3rd, and so they didn't call for water historically on June 3rd. So is June 3rd sort of the problem here? I want to use it as a proxy, but is that a problem? No. That's just – that is how the irrigator used their water during the irrigation season. Right. And so with NIFWF calling for its water every day when the water right is in priority, it's going to use its water more days per year than the irrigator used per year. And if you look at the consumptive use – But the overall water will be the same. No. No, no, no, no. No, no, no. No, Your Honor. No. So if you look at the consumptive use – Will it be more than 3.1? 3.1? It'll be 3.1.01 more days of the irrigation season than the irrigator used it. That's why the judge was correct when he said you have to go back. Okay. That doesn't seem to jibe with anything in the engineer's report. I thought the 3.1 and the 4.122, one being a flow rate and one being a volume rate, were going to be the same at the end of the year as the prior appropriators from which the foundation acquired its rights. That's how much they're able to take per day. And that's why the state engineer multiplied it by 245 days. Right. And so at the end of the irrigation season, the foundation will have used just the same amount of water as the prior appropriators would have used. Absolutely not. Absolutely not. And, Your Honor, if you look at the net irrigation water requirement study that's from the state engineer's office, you'll see based on the simulations that they did for the consumptive use, Mr. Schneider's use of the water, that's the farmer that they used in Mason Valley, he didn't start his use until March 20th, and he ended his use on September 28th. And then there were those four cuttings in between. And under the decree, Mr. Schneider wouldn't have called for his water until March 20th every year and would have stopped using his water on September 28th every year. NIF was going to start calling for its water on March 1st of every year, and it's going to be calling for its water until October 31st of every year. Right, but the calculation, that is, from March 1st to the end of September or March 20th to the middle of September, the total water called for is going to be the same. It is not, Your Honor. It is not going to be the same. And that's what I'm trying to say. So you are contesting about the consumptive use, then? Not contesting about the consumptive use figure at all, the 4.122 or the 301. What we are contesting is that by the timing of calling for those flows and by NIF calling for that right every day when it's in priority, it's using more water. The total number of days per year, the judge was correct. The total number of days, I understand. But whether you call for water four out of five days or call for water all five days, if you're still calling for the same amount of water by the end of the week, what difference does it make? But that's what's happening, Your Honor. If you call for 4.122 CFS for four days versus 4.122 CFS for five days, you're calling for more water. And if that's true, then at the end of the season, your consumptive use would be far greater, wouldn't it? Totally. That's the problem. That's the big issue here. But the stipulation was we will only use 3.1 acre-feet per acre as the total consumptive use at the end of the year. Correct. Correct. But they're going to be using it for more days of the year than the farmer. Right. But they will be using less each day than you would if you had been the farmer because that's the only way it will work out if you're calling for it on more days. But that's not the way the state engineer granted the permit, and that's not the way the state engineer approved the transfer application. The state engineer approved the 4.122 times 245 days, which is the entire irrigation. Right, but it still gets you to 3.1, and that is the total consumptive use. It gets you way over 3.1. I thought we did the math in chambers. I thought it came out. Was the math wrong? The math is not wrong, but the timing is wrong under the decree. Okay. If the math is not wrong, then I still don't understand the problem. And it has to do with the timing of it, Your Honor. Right. So if you've got a farmer who says, look, I'm going to, and we'll just use a five-day week, a five-day watering week, Monday through Friday, says generally I only need water four out of five days because I don't want to overwater. So I'm just going to call Monday through Thursday, and I'm entitled to so much water. So I'm only going to need 25% each day. And then the foundation comes in, purchases rights, and says, well, we're going to call for the water. We're going to call for it every day. So we only need 20% each day. The end of the week, same amount of water, irrespective of the user. There's a little bit difference there in the amount each day that's been taken. Understand that. Right, but that's not how they call for their water. So they can call for the whole diversion rate every day that it's in priority. But there's still a cap to 3.1, right? No. No, no, no. That when you multiply it out. The 3.1 is meaningless? Is that what you're saying? No, the 3.10 is what the crop consumes. Yes, that's the amount that the crop consumes. Yes. But they have stipulated they're only going to use 3.1. Are you telling us that they're going to use more than 3.1? In the aggregate. Then you disagree with the stipulations. We disagreed with the stipulation that that. I thought that the engineer proceeded on the assumption that the stipulation was the cap to 3.1. If that's true, if what you're saying is true, then they're going to be using more than 3.1. Then you're telling us that the engineer has just got it all wrong. He did. That's what I'm trying to say. He used the cap.  That argument you're making? We didn't make that. We didn't sign that stipulation. What we brought up was. How much will they be using? Can you give us a number? You should have been able to calculate this. Well, it's going to be the total amount. If they use the 4.122 times 245 days per year, it's the 2,003 acre feet. Right. Which also is the same as the 3.1. If you convert the 3.1 to that. Correct. So the total amount of water at the end of the year is going to be the same. I understand that it may change the flow rate each day or the call each day. But the total amount of water at the end of the year has got to be the same. Otherwise, you disagree with the stipulation. And the engineer's findings are clearly erroneous. Right. They are clearly erroneous. But again, the amount in the stipulation was the 4.122 CFS, the flow rate. And then the state engineer allowed NIFWF to use that times 245 days. Okay. What I'm saying is the farmer would have used 4.122 maybe times only 100 days. Because of the variation and not being able to use the water during the entire season. If they only used the 4.122 over a course of 100 days, then they would have used far less than 3.1 AFA at the end of the season. Right? No. The crop would have consumed the same amount based upon the study. That's just the crop part of it. I worked through the math. I thought I understood it. And now I am totally confused. That's why you have to look at the days and the days that the farmer called for the water. Because the farmer is not going to call for the water every single day. And so that number that the state engineer used, the 245, it's going to be a lot less. And that's how the state engineer converted the flow rate to the acre feet per year. Let me ask a question this way. Under your worst case scenario and under the state engineer's order, how many acre feet would be, in effect, attributed to consumptive use that the foundation is getting? The consumptive use portion that was transferred was the 3.1 acre feet. It's still 3.1? That was the amount that was transferred by the state engineer, yes. But the state engineer enlarged the right. I'm talking about your case. You agree still, no matter how the daily use varies, it's still going to only amount to 3.1? No, that's the part I disagree with. Well, how much is it going to amount to? It depends on what the historical practices were for this water. And you don't know that? No, that's why the remand went back to the state engineer. Because the district court needed to know how many days this particular farmer used their water. But you know for sure it's going to be more than 3.1? I know it's going to be less days than 245 days per year, which is the irrigation season. So if you look at Mr. Schneider's – can I try to explain it in the context of the state engineer's study? If you look at Mr. Schneider's use, his use for Mason Valley was using it from 320 to – Did he ever call for more than 4.122 CFS on any given day? Well, he would have called for more, but the consumptive use portion of that was only the 4.122 CFS. Wait, he could never get more than 4.122 as a flow rate? Well, that was the amount that the crop used. The flow rate would be the 7.745. That's the amount that was delivered to the farm. And then from the farm he used the consumptive use portion of that was the 4.122. And over the course of an entire season, how much did that turn out to be in acre feet? That the farmer used? Yeah. Well, I actually haven't done that calculation, but I can tell you how many days he used his water. And it wasn't 245 days through the irrigation season. I thought that the stipulation said that the prior appropriators had their consumptive use was 3.1. There's two different ways of sort of calculating that. One is you can do it by flow times the number of days, or you can just do it by total volume. If you focus on total volume, that will tell us how much water they've actually used in the course of the season. I thought the stipulation said that they used 3.1. That if they had consumptively used all that they were entitled to, it would have been a whole lot more water than that. Right. That's all correct. Okay. That's all correct. So we took out of the system 3.1 acre feet. The crop consumed 3.1 acre feet. None of that gets returned. Junior appropriators don't have any access to 3.1 acre feet per year. Correct. And that's per day? That would be per, well, 3.1 per acre foot. Yeah. The total duty that was granted, 3.1 acre feet of that amount, was consumptively used by the crop. Per day. I'm not, they did it over the whole season. They got their analysis was based upon the whole season of use. And if you read the report. I'm confused now. You're talking about number of days. And you're saying they get this fixed amount. But he'll only draw it at 100 days. And the foundation will take it 245. So you're multiplying the entitlement for the use times the number of days. That's why I'm confused why you're not saying it's either total or it's a per day rate. That's where I'm getting thrown off. Well, of course, when they did the study, they looked at the whole season. And that's how they came up with 3.1. Because they looked at what, for the four cuttings, from the 320 to the 928. And that's how they came up with the 3.1. That that would be the consumptive use for the season for that crop. The total season they only used 3.1? On average. But then, of course, it depends on how many acres you have. That's per acre. And they multiplied that by whatever it was, 646 acres in alfalfa. Right. If that's what the acreage was that that farmer had. Okay. But, again, the timing of it, the judge was correct. The timing of it is very important. And, again, as I just stated in the example, we have a really good water year right now. And the NFWF would call for its water every day. And the farmer wouldn't be calling for its water every day. And NFWF is going to be calling for the 4.12 CFS. And that's not what the previous irrigator, that's not the amount of water that the previous irrigator used. Because they didn't use 4.12 CFS every day of the year. No, but they did use 3.1 acre feet over 646 acres at the end of the year. Yeah, if that's what they did. If that's what they did. But that's the maximum. That's why the judge was so concerned about the timing. And that's what the importance of the no injury rule is. Is that junior appropriators can be harmed because of changes in the use by the senior appropriator that's going to impact the junior appropriator's rights. And as we get back to the decree, what the judge was concerned about is that if there is an expanded use of this irrigation right by NFWF, because they're going to be calling for their right every day, then that's going to impact the junior users because they're not going to have an opportunity to store water under the decree, under the refill right. And RID did acknowledge in its reply brief that the water right holder, the storage right holder, is a beneficial owner of that water right. Oh, wait, we're talking about people who are leasing water? The people lease the water, the storage right owners, holders, they are leasing the water to RID for the program. For the NFWF water leasing program. But under the decree, the water master testified before the state engineer, those water right holders, the storage right holders, are decree right holders. We recognize them as decree right holders under the decree because they're assessed like a natural flow right, water right holder is. That's specifically called for under the decree, that the assessments are made to all waters of the Walker River, including stored and storage water rights. That the rules that the water master can develop for apportioning and distributing the waters of the Walker River apply to all the waters of the Walker River, including the stored and storage water rights. And there is going to be unintended consequences if for some reason there is going to be a holding that those individual water right holders are not decree right holders. Because we have assessed them all for the last I don't know how many years under the decree as water right holders. And we consider storage right water to be decree water. The water master operates the reservoir. The water master is the one that allows releases from the reservoirs. The water master keeps records of irrigated diversions from the river based on natural flow rights or whether there's storage water rights. There's no distinction in the decree for the uses, the irrigation uses, as to whether it's a natural flow right or it's a storage water right. And there's no functional difference under the decree for the use of that irrigation water. And I guess that's why the judge was very concerned moving over to the California decision. Because we make no distinction. I mean, it's all water used for irrigation purposes under the decree in the system. And that's why we're concerned about the California decision because the California decision, apparently using California law, decided that for the irrigation right and the transfer of storage irrigation right, that there didn't even need to be the deduction for the non-consumptive use portion and that the whole non-consumptive use portion and the consumptive use portion of that irrigation right could be transferred to the in-stream flow. And this court has held in the TCID case that a water right owner on a transfer is only allowed to transfer the historical beneficial use, specifically under an irrigation right. So it's confusing because we're transferring irrigation rights under California and Nevada law. They have no functional difference under the decree. And we're getting different rules from each agency as to how much can be transferred under that use. And that's why it's really important that we get this all straight at the very beginning because there's a lot more transfers that are going to be coming down through the years. So the other thing I was concerned about with regard to who owns the water rights in RID are there were provisions in the findings of fact that the judge entered, Judge St. And as I said, RID admits in its brief that the storage right holders are the beneficial owners of the water rights held by RID. And the decree also recognizes that it's in Section 11 that all persons claiming by, through, or under a party to the suit that they're enjoined and restrained from claiming any other right except as set forth in the decree. And there are other water right holders under the decree that hold their water rights for the benefit of, well, the Antelope Valley Mutual Water Company. They hold their water rights for the benefit of their shareholders. And, of course, the tribe holds water rights in the U.S. for the benefit of the tribal members. And I'm concerned about some unintended consequences that may occur if, for some reason, the people that we've been assessing and the water right holders that we've been assessing for the last 70 years are now determined not to be decree right holders. Because, for example, one of our board members, to be a board member you have to own water rights under the system. And our tribal member that sits on our board is an allotment owner of water rights. So there was no finding by the district court that the storage right holders were not junior right holders under the decree. There was no finding by California that the storage water right holders were not junior water right holders under the decree. There was no finding by Nevada State Engineer that the water right holders, storage right holders under the decree were not water right holders. And then the last issue has to do with prohibition in the decree regarding water shall not be sold or delivered outside the basin of origin. And just going back to 1936 when these people were developing the language for that stipulated portion of the decree. I mean, they weren't using the term basin in a technical or scientific sense because they were writing some kind of hydrology report. And obviously they understood that Walker Lake was the terminus of the Walker River system. And what they were trying to do was... Does anybody have rights to take water out of the lake? Nobody has rights to take water out of the lake. And I think the district court judge was correct that the no export provision has to be read in light of the overall intent of the decree, which was to preserve the waters of the Walker River for... If Walker Lake were not a terminal lake, but there was another extension of the Walker River below that headed down towards Hawthorne, you have no question that the lake would be part of the basin, right? Totally agree. So why is it not part of the basin just because it turns out to be a terminal lake? What does that mean all of a sudden that we're going to lop it off before we get to the lake? Because the judge was correct in looking at the overall intent of the decree and determining... It's clear that the decree was talking about who gets to take water out of the river, but that doesn't mean that the lake is not part of the basin. There may not be decreed rights in the water that makes its way into the lake, but that doesn't mean as sort of a practical... Whether you were talking about hydrologically or whether we're talking about conversationally, the Walker River basin surely includes the lake that it flows into. It seems extremely artificial to say that the basin does not include the lake. Well, look at it from what was happening in 1936 and what the people that were involved with the decree were trying to do. And again, remember that water under the decree... It really violates the export rules to put water out of the river into the lake that it naturally flows into? Yeah, they wouldn't have allowed that back then. And the reason they wouldn't have allowed it back then is because there's multiple uses throughout the system of the water by as many users as possible. And if the overall intent of the decree was to preserve the waters of the Walker River for the beneficial owners of that, of course they would have agreed, yes, that there's no water that's going to be sent over the hill to another basin except Conway because that water then is taken out of the system and it's not allowed to be used for the use in the system. And Walker Lake's a perfect example of that at the end of the system because it's downhill, it's at the end of the system after all the other users. There's no water right in Walker Lake. There's no use on the other side of Walker Lake. There's no way to pump water from Walker Lake back upstream so that there can be further uses by the other water right holders in the system. And so, yes, they never would have allowed water to be sold or delivered when it can be used up here multiple times. They never would have allowed it to be delivered or sold to Walker Lake because it would have been lost to the system and it wouldn't have been able to be further used in the system. And that's why it's important that these in-stream uses that, well, these irrigation rights that are being transferred to in-stream uses, you're taking water out of the irrigation system. And so it's really important when you're going to be taking water out of the irrigation system that you only take the quantity that the historical beneficial use of those. The prior appropriators, the senior appropriators from which the foundation acquired its rights, how much water were they taking out of the river on any given day? We don't know, Your Honor. That's why it was remanded that way. They had a right to take out 7.745, right? In priority, yes. And then we know that some figure 4.6 would have come back into the system. That leaves us with 3.1. I'm sorry, it would have been 3.6 would have left us with 4.1. Correct. 4.122. So they were taking some larger volume of water out of the river. Correct. Then the foundation would be taking out of the river, is that right? Or taking out of the system that's available for irrigation for junior users downstream. Weren't the prior users taking more water out of the river? The prior users were taking more water from the river, yes, and they were placing it on their crop and the consumptive use portion was the 4.122. Which is returning. No, the 4.122. I'm sorry, it was what was used by the crop. Right, and that other number, 3. whatever that you said, that was the amount that was returning as return flows to the system. That could be further used in the system. Right, so that water is still there today, wouldn't it? The 3.1? The 3.6. The 3.6? The 3.6 is going to be still in the system? Will still be in the system. That's what the junior users had with the prior appropriators was 3.6. Right. And won't they have 3.6 today? Right, but the junior appropriators also had the senior water right holder not calling for their water on certain days so that they were able to use the water master was able to use the refill right if he was on full decree and the water master was able to put water in storage. Can the water master make adjustments to put water in storage today? Under this proposal? If there's not, if the timing works out under the decree so that there's not as many people using, not as many senior appropriators using their water rights on a certain amount of days, but if you're going to allow the in-stream use to be every single day because you think the math works out like that, then there's not going to be as much opportunity for the water master to put water in the storage reservoir. Can I clarify your point about the lake not being part of the basin because the decree was all focused on the river? Why would it have been totally outside the scope of that decree when they were thinking and negotiating it as to what would happen with the water once it did enter the lake? It means they aren't deciding that somebody's going to be extracting water from the lake, but that's the whole end point of the river. And so they've got to believe that once they've taken care of the users along the river flow, that there's going to be a lake at the end of it. And wouldn't they want to protect that lake? Otherwise they could say, okay, we can use up all the water before it gets to Walker Lake. We'll find all sorts of uses for that. And so at the end of the river uses, there's no water left to run into the lake as an extreme example. You're not suggesting that, are you? No, I'm not suggesting that. What I am suggesting, Your Honor, is that they were concerned about their uses when the decree was being drafted. They were concerned about their uses that were all upstream. I know that. I understand that. But you're saying they had no concern, no thought about the end point of what this water flowed through here? It's hard for me to believe that they didn't have in mind that at the end of whatever the uses were upstream from the lake, that there would be water running into the lake. We're going to get into that in a later case, I know. But the idea that somehow they were only focused, and therefore the basin in their minds only went so far as the edge of the lake and that the lake wasn't really part of the basin. Right, because they were, again, they were trying to preserve the waters of the Walker River for the appropriate beneficial users that they had at that time. And they had no concern about their beneficial uses might exhaust the water before it got to the lake. They were trying to use the water as much as they could before it got to the lake. And if they'd had the demand and the ability, they could have dried up that lake, and with no consequence and no somebody else coming along and saying, wait, wait, wait, you guys can't all get together and do that and dry up the lake. Right, no, I don't think that they were trying to dry up the lake. I don't either. Yeah, but I think that if they started in 1860 or whatever they started irrigating, then they were trying to protect the water rights that they had established. They were definitely trying to do that upstream. Yeah. And again, preserve because the water is reused so much in the decree by as many users as possible, depending on the conditions. That also involves the public trust issue, doesn't it, that is going to come up in another case? Right, and you know what? I don't have anything to do with that because we're not involved in that. One last question. We've consumed a lot of your time, but I do have one last question. In the Walker Basin Restoration Program, the federal law, Congress uses the word Walker River Basin in a number of places here and says they're establishing this foundation for the purpose of restoring and maintaining Walker Lake. There's no reference in here to the Walker River. It seems to me that we have sort of three different terms that get used, the Walker River, Walker Lake, and Walker Basin. And it looks like in the way that Congress used these terms, that it assumed that the Walker Basin included both the lake and the river. I would say that would be true. Right, but if you look at the congressional intent also, the district court's ruling is not inconsistent with that because it says program funds shall be used to preserve Walker Lake while protecting agricultural interests in the Walker River Basin. Right, but it doesn't seem – it seems that Congress assumed that the lake was part of the basin. And it doesn't seem like that's not a common sense assumption. You want to argue that we have to be very legalistic here and not take a common sense approach. Well, I have to follow your rules. Like you said, in Wackerman versus the Wackerman Dairy, what the rules of constructing a decree are. So we're following your rules, like you said, to construct the decree. All right. You should. Thank you very much. Thank you, Ms. Peterson. Mr. Napal, you can use your time any way you want, but I hope that you'll help us understand the math. Do you want me to understand the math? Well, I would like you to understand the math. And then if you can help us understand the math, that would be great. I'd be a tuper. The 3.1 takes into account all the things that the council was speaking of. It takes into account the fact that the irrigation season may start not on March 1st. The plants will not consume as much water if it's cold than they do when it's warm, and that there is a variability in how much plants consume while they're being harvested, and that the irrigation season doesn't end on October 31st. If I understand, it just seems to me that what the stipulation does is that it assures that at the end of the year, the foundation has only taken the same amount of water out of the system that the prior appropriators would have taken out of the system. Is that correct? It absolutely is. Okay. Now, if I understand Ms. Peterson's position on behalf of the board, the board's concern is that what the foundation is doing is taking a flat-line average amount every day, and that the prior appropriators did not take a flat-line average every day, that it varied, and that that will result in sort of a misappropriation on a day-to-day basis for junior appropriators. I don't think that's correct, partly because... When you say you don't think that's correct, you don't think that's her position, or you think her position is wrong? Her position is not correct, Your Honor. The 3.1 takes into account that it's not a flat-line every day, and so the fact that NFWF, first of all, NFWF can only call for this water if it's in priority, and the likelihood of it being in priority every day is pretty slim with the exception of years like this, but the 3.1... There are still senior users, they're senior to the foundation. Yes, Your Honor. And the other thing is that Mr. Springmeier mentioned rotation. Not only is rotation allowed by the decree, farmers rotate with themselves, so that if they're large enough, they're not going to have all of their crops cut at one time. They may have half the ranch cut and may still have the other half not cut, so they can rotate water as long as they're in priority. They can use it every day on other land. So, although the 4.122 is an average... That's an average flow rate for 245 days of the irrigation season. That converts to the 3.1 acre feet. Does that mean that the foundation won't necessarily get 4.122 CFS every day? It likely will not because of priority. Well, but you do agree with Ms. Peterson's argument that, well, I think this is part of it, that the state engineer's order does not address, I'll call it the timing issue at all, right, if there is such an issue. It doesn't address that. And isn't that her complaint, that it should address it because timing, you know, and the established, I'll say established and customary use of withdrawal, is something that junior appropriators have, in a sense, come to depend on as part of their right. Isn't that her argument? That's her argument, but they don't have that right, Your Honor. The senior appropriator is entitled to call for their water when it's in priority. At any time? At any time during the irrigation season. We asked the water master on the stand, do you tell somebody it's too cold to irrigate? No. Do you tell somebody they can't irrigate because it's raining? No. Do you tell someone when they should harvest their crops? No. So the fact of the matter is, people can call for their water when it's in priority. But that means, then, that the foundation may be calling for water on days in which its prior appropriators wouldn't have called for water. Perhaps. Okay. And that does represent a change. That represents a change, but not an unlawful change, because the prior appropriators could have called for their water if they wanted to. May I quickly address the argument that we have two different rules here? California and the state engineer did not apply two different rules. They applied the same rule to different facts. And the different facts were, state engineer was dealing with a natural flow water right. California state board was dealing with a stored water right. And the difference between those water rights is the reason that one is limited to the consumptive use and the other one isn't. The stored water, but for that storage, it wouldn't have been in the system at all. The Truckee Carson Irrigation District case that counsel refers to has no precedence here whatsoever. First of all, that was not a case dealing with stored water. Second, the language the judge quoted and that counsel quotes is language where the court was responding to an argument that the United States and the tribe made during oral argument. It had nothing to do with the holding in that case whatsoever. Your Honor, would it be inappropriate for me to respond to your question on section 7.9 of the administrative rules? No. No, it's been raised. I was in a different spot when these rules were written. And the first sentence of section 7.9 was added to the rules by Judge Reed. And the important part of that sentence is the last part where the court says, the court shall conduct a de novo review of all agency decisions regarding change applications which recommend modification of the decree, irrespective of whether any party files a formal request for judicial review. In my judgment, what he was saying is I'm going to look at these even if nobody's upset about them. And as you point out, Your Honor, when you go on and read this, it's pretty clear that he contemplates standard review under an administrative action. And Your Honor asks a question about the additional evidence. There's a specific rule that says you can only offer additional evidence if you can show why there was a good reason it wasn't submitted to begin with. Thank you. All right. Thank you very much. We thank all counsel. This is a very, very complicated case, and we appreciate counsel helping us with the argument. The court is going to take a brief recess, and then we'll resume with the remaining water cases. So the court is at recess. All right.
judges: Tashima, Fisher, Bybee